IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLYDE ANTHONY,

     Plaintiff,

v.

GEORGIA DEPARTMENT OF
PUBLIC SAFETY,

     Defendant.

CIVIL ACTION FILE NO.
1:19-cv-05303-SDG-LTW

**MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION**

Plaintiff Clyde Anthony filed the above-styled employment discrimination action on November 21, 2019. [Doc. 1]. Plaintiff's Second Amended Complaint, which was filed on March 9, 2020, is the operative pleading in this case. [Doc. 12]. Plaintiff's claims against Defendant Georgia Department of Public Safety are for race discrimination based on Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* [Doc. 12]. Plaintiff Anthony alleges that Defendant subjected him to unwarranted investigations and denied him promotions on the basis of his race. [Id. ¶¶ 25, 26]. This case is presently before the Court on a Motion for Summary Judgment [Doc. 45] filed by Defendant pursuant to Federal Rule of Civil Procedure 56.

I.   **FACTS**[1]

Plaintiff Clyde Anthony is an African-American man.  [DSMF ¶ 1].  Plaintiff Anthony was employed with Defendant Georgia Department of Public Safety ("DPS") from March 1, 2007, until his retirement on November 1, 2020.  [DSMF ¶ 2].  While Plaintiff was employed with DPS, he also worked secondary jobs at Passion City Church on Sundays and at different construction zones during the week.  [Plaintiff Deposition ("Pla. Dep.") at 44-45].  Plaintiff testified that he earned around $30,000 or $40,000 extra each year from secondary jobs.  [Id. at 45-46].

On January 31, 2017, Plaintiff was issued a mid-point job performance review for the 2016-2017 rating period.  [DSMF ¶ 57; Maier Affidavit ("Aff.") ¶ 26; Doc. 45-7 at 97].  The review outlined deficiencies in Plaintiff's job performance with regard to several goals.  [Id.].  Plaintiff's poor performance assessment was due in large measure to a failure to make the recommended number of traffic stops.  [Pla. Dep. at 79; Doc. 45-7 at 103-06].  The review informed Plaintiff, in part: "Currently at the midpoint you have issued 175 enforcement actions for speeding, 0 for distracted driving, and 0 DUI arrests out of a total of 482 total traffic stops.  These numbers are below, and in some cases well below, what would be expected."  [Doc. 45-7 at 97].

---

[1] The facts are taken primarily from Defendant's Statement of Undisputed Material Facts ("DSMF") [Doc. 45-2] and Plaintiff's Response ("Pla. Resp.") to DSMF [Doc. 47-1].

Plaintiff testified that Sergeant First Class ("SFC") James Buchanan "held up on my promotion, he stated because lack of traffic stops, which is unconstitutional to put a number of citations or stops on an officer." [Pla. Dep. at 79]. Plaintiff was ultimately given an overall rating of 2.6 (Successful performer – Minus) on his 2016-2017 performance evaluation. [Maier Aff. ¶ 27; Doc. 45-7 at 101; DSMF ¶ 58]. Plaintiff's performance was assessed, in part, based on performance standards for Post 48, where he was assigned. [Maier Aff. ¶ 28; Doc. 45-7 at 103-06; DSMF ¶ 59].

On or around June 28, 2017, Plaintiff applied for a position as Executive Security with the Governor's detail. [DSMF ¶ 61]. The position was given to Jamael Sanford, a black man. [DSMF ¶ 62]. DPS Human Resources Director Kate Maier testified that DPS utilizes a competitive promotional process for determining the suitably for promotion of interested candidates within the Department. [Maier Aff. ¶ 31; DSMF ¶ 63]. Maier also testified that the competitive promotional process utilizes a written examination and assessment exercises to establish the suitability for promotion of the competing candidates. [Maier Aff. ¶ 32; DSMF ¶ 64]. According to Maier, trained assessors utilized in the process are neutral professional law enforcement officers from outside of the Department. [Id.]. DPS Policy 24.01 requires that eligible candidates interview before the promotion board to make a brief presentation regarding their qualifications and skills. [DSMF ¶ 65]. The policy further states that the

"Commissioner shall select between the applicants based on objective job related considerations. Such job related considerations shall include, but not be limited to, the following: productivity/performance, years of service, education, written test score, assessment score, vacancy assignment, disciplinary record, awards, etc. No particular weight shall be given to any of these factors. Rather, they will be considered by the Commissioner as a whole to insure the most suitable candidates are selected." [Id.].

In August 2017, Plaintiff Anthony held the rank of Trooper First Class ("TFC") 2 and reported to SFC James Buchanan. [DSMF ¶ 3]. On Saturday, August 5, 2017, Plaintiff had a flat tire and could not drive himself to a detail he was scheduled to work that morning at Stone Mountain. [DSMF ¶ 4]. Around 8:00 a.m., Plaintiff began to call other Troopers to look for a ride. [DSMF ¶ 5]. Ultimately, Plaintiff contacted SFC Buchanan, his immediate post commander, to explain the situation. [DSMF ¶ 6]. SFC Buchanan informed Plaintiff that he would send the on-call troop car for him. [DSMF ¶ 7]. The night before, August 4, 2017, Plaintiff had gone out and had a few drinks. [DSMF ¶ 8]. On the morning of August 5, 2017, Plaintiff's Assistant Troop Commander, Lieutenant T.J. Jackson, received a verbal, unconfirmed report that Plaintiff might be intoxicated. [DSMF ¶ 15; Doc. 43-1].

Plaintiff testified that TFC Colby Johnson picked him up on the morning of Saturday, August 5, and drove him to DPS Headquarters. [Pla. Dep. at 12-14]. Plaintiff

then got in his patrol car and headed to Stone Mountain, but he received a text message from SFC Buchanan instructing Plaintiff to wait at Headquarters. [Pla. Dep. at 14]. Plaintiff then turned his car around and headed back to DPS Headquarters and parked his car in the parking lot of a nearby credit union. [Id.; DSMF ¶ 12]. SFC Buchanan and Lieutenant Jackson drove separately to meet Plaintiff at DPS Headquarters. [DSMF ¶ 12]. Lieutenant Jackson reported that, upon realizing Plaintiff had operated his state patrol car, and in light of the reports that Plaintiff might have been intoxicated that morning, he and SFC Buchanan became concerned that Plaintiff was possibly impaired while driving his state vehicle. [DSMF ¶ 15].

Lieutenant Jackson reported that once he reached Plaintiff, he detected an odor of alcoholic beverage. [DSMF ¶ 16; Pla. Resp. to DSMF ¶ 16]. After SFC Buchanan arrived at their location, Lieutenant Jackson called Troop Commander Captain Nikki Renfroe. [DSMF ¶ 17; Pla. Resp. to DSMF ¶ 17]. After conferring with Captain Renfroe, Lieutenant Jackson informed Plaintiff that he would need to test him for DUI/field sobriety tests. [DSMF ¶ 18; Pla. Resp. to DSMF ¶ 18]. Lieutenant Jackson and SFC Buchanan administered the testing, including horizontal gaze nystagmus, walk and turn, one leg stand, Romberg testing, and two administrations of an alco-sensor test, on which Plaintiff blew a .016 and .014, respectively. [DSMF ¶ 19]. It is against DPS policy for employees to be under the influence of alcohol while on duty,

5

even if their level of intoxication does not rise to the limit of being legally impaired. [DSMF ¶ 20].

Captain Nikki Renfroe received instructions and paperwork from DPS Human Resources Director Kate Maier, advising that Plaintiff should be taken to an approved facility for testing for alcohol. [DSMF ¶ 21]. Plaintiff submitted a breath sample at the facility and, according to the facility's paperwork, the results of his testing were 0.000 at 2:30 p.m. [DSMF ¶ 22]. Plaintiff was then driven home. [DSMF ¶ 23]. Plaintiff testified that on the following Monday, August 7, 2017, SFC Buchanan told him that he was being placed on administrative leave. [Doc. 47-2, Plaintiff's Declaration ("Pla. Dec.") ¶ 3]. Plaintiff received his full pay and benefits while he was on administrative leave. [Pla. Dep. at 45]. However, SFC Buchanan told Plaintiff that he was not permitted to work a secondary job in law enforcement or security while he was on administrative leave. [Id. at 42].

Captain Renfroe assigned Lieutenant Ritchie Howard to conduct interviews of all known personnel who had contact with Plaintiff on August 5, 2017. [DSMF ¶ 24]. Plaintiff remained on administrative leave for the duration of Lieutenant Howard's investigation. [DSMF ¶ 25]. Lieutenant Howard's investigation revealed that Senior Customer Service Agent ("SCSA") Diegra Davidson was the initial source of the report

that Plaintiff might be reporting to work while still drunk from the night before.

[Howard Dep. at 85; Doc. 42-2 at 3; DSMF ¶ 26].  Lieutenant Howard testified:

> During my interview, [SCSA Davidson] stated that I think she woke up
> sometime that morning and observed some videos.  I'm not familiar with
> social media to the point that I know what these mean, but Snapchat, that
> she observed some videos that were posted the previous night covering a
> certain period of time, and she believed to be excessive drinking showing
> Mr. Anthony at various bars, and that's how she came to the conclusion
> that he was under the influence or had been under the influence.

[Howard Dep. at 89].  Captain Renfroe testified that after she received the results of

Lieutenant Howard's investigation, she recommended that Plaintiff remain on

administrative leave in order to complete counseling and undergo a fitness for duty

evaluation.  [Renfroe Aff. ¶ 7].  Plaintiff testified:

> After Lt. Richie Howard completed his investigation, Captain Renfroe did
> call me and laughingly said, 'Can you believe this – H.R. wants you to
> undergo a fitness for duty exam prior to returning to duty?'  The Captain
> further stated to me, 'I thought all of this was over but don't worry we'll
> get through this.'

[Pla. Dec. ¶ 4].

Based on his tenure with the Department, Plaintiff Anthony was first eligible for

promotion to Trooper First Class 3 on September 1, 2017, while he was on

administrative leave.  [DSMF ¶ 53].  In order to be approved for promotion, a Trooper

First Class 2 must have the following: 1) three years of experience as a Trooper First

Class 2; 2) supervisory recommendation for promotion; 3) participation in the Physical

Fitness Evaluation Program; and 4) completion of Accident Reconstruction Level III or command staff approved alternative. [DSMF ¶ 54]. Plaintiff completed the required Accident Reconstruction Levels and participated in the Department's Physical Fitness Evaluation Program. [DSMF ¶ 55]. However, Plaintiff's direct supervisor, SFC James Buchanan, wrote a letter to Major Tommy Waldrop on August 25, 2017, recommending that Plaintiff not be promoted to Trooper First Class 3. [Id.; Doc. 45-7 at 96]. Captain Nikki Renfroe recommended that Plaintiff's promotion be reconsidered after the mid-point of the 2017-2018 rating period. [DSMF ¶ 56]. DPS Human Resources Director Kate Maier testified that from September 1, 2017, to April 1, 2020, the Department had several white Troopers who did not receive promotions due to performance issues. [Maier Aff. ¶ 29; Doc. 45-7].

While Plaintiff was on administrative leave for the August 5, 2017 incident, Captain Renfroe occasionally checked Plaintiff's social media accounts for any questionable content. [DSMF ¶ 34]. Captain Renfroe testified that in or around September 2017, she came across a video on Plaintiff's Facebook page in which it appeared Plaintiff was marketing an at-home breathalyzer device. [Renfroe Aff. ¶¶ 10, 11; DSMF ¶ 35]. Plaintiff testified:

> The company was looking into trying to advance in coming up with a device that would help check your blood alcohol level if you was at a restaurant or at an event that would help in the future to reduce the number of impaired drivers, the number of DUIs or intoxicated drivers. And in

8

that video I was explaining how helpful that would be for people in social environments.  I thought it was a wonderful thing that I heard of.

[Pla. Dep. at 71].

Captain Renfroe testified that she had two concerns about the video: 1) it was linked to alcohol intake at a time when she had questions about Plaintiff's relationship with alcohol; and 2) if Plaintiff was selling a product, it could implicate DPS policy on secondary employment.  [Renfroe Aff. ¶ 12; DSMF ¶ 36].  Captain Renfroe forwarded a link to the video to Major Waldrop, who then asked Internal Affairs to look into it.  [Renfroe Aff. ¶ 13, Ex. 2; Maier Aff. ¶¶ 14, 15, Ex. 5; DSMF ¶ 37].  Internal Affairs Investigator Ashley Haines conducted a brief investigation into the Facebook video.  [DSMF ¶ 38].  The investigation did not result in any adverse actions being taken against Plaintiff.  [DSMF ¶ 39].

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or around November 15, 2017.  [DSMF ¶ 68].  Plaintiff alleged in the Charge that he had been subjected to discrimination based on race.  [Pla. Dep., Ex. 20].  In the narrative section of the Charge, Plaintiff wrote in part:

> On or about August 5, 2017, I was falsely accused of being under the influence of alcohol while on duty.  I was stripped of my badge and weapon, given two breathalyzer test [sic] at my post location.  I was the [sic] transported to and given an official third party breathalyzer test in which the results were negative.  Despite the fact that I informed my command that I was not under the influence and the negative test results, I was subjected to different terms and conditions of employment in

> regards to disciplinary actions when I was placed on paid administrative leave for an indefinite period of time and have not been allowed to return to work.  On September 1, 2017, I was passed over for promotion to Trooper 1st Class 3.

[Id.].  The EEOC issued Plaintiff a Notice of Right to Sue on or around August 22, 2019.  [DSMF ¶ 69].

Plaintiff was aware that he needed to complete a Fitness for Duty examination and that he needed to complete Employee Assistance Program counseling before he would be returned to duty.  [DSMF ¶ 33].  While on administrative leave, Plaintiff sought care from his personal doctor, but he never sought treatment for substance or alcoholic dependency.  [DSMF ¶ 29; Pla. Dec. ¶ 5].  On or around November 16, 2017, Plaintiff requested leave under the Family and Medical Leave Act ("FMLA"), indicating that he was suffering from stress and anxiety.  [DSMF ¶ 30].  DPS removed Plaintiff from administrative leave and placed him on sick leave, which was covered by FMLA, until the end of November 2017.  At that point, Plaintiff's doctor cleared him and he was placed back on administrative leave.  [DSMF ¶¶ 31, 32; Pla. Dep. at 59-60].  Plaintiff signed a Return-to-Work Agreement on January 4, 2018, and he returned to duty on February 1, 2018.  [Pla. Dep. at 63, Exs. 11, 16].  When Plaintiff returned to work, he did not experience any change in rank or pay.  [Id.; Maier Aff. ¶ 17].  Plaintiff testified that he did not work any secondary jobs while on administrative leave.  [Pla. Dep. at 45-46].

Plaintiff was eligible to participate in the promotional process after September 1, 2012, when he completed one year of satisfactory service as a Trooper First Class. [DSMF ¶ 66]. Maier testified that since becoming eligible, Plaintiff has either chosen not to participate in the promotional process or has not successfully completed the process in order to be considered for a Corporal (supervisor) position. [Maier Aff. ¶ 34; DSMF ¶ 66]. Plaintiff testified that during the time of the September 2017 Corporal Exam, he was out on administrative leave and his then-Corporal, Chad Harris, phoned him and told him "not to attend an official matter in DeKalb County which was previously generated before [he] was placed on Administrative Leave." [Pla. Dec. ¶ 10]. According to Plaintiff, Harris stated that Plaintiff "was not to handle or participate in any official matters having any connection with the Department or until [his] Administrative Leave was over." [Id.]. However, there is no DPS policy which states that employees on administrative leave are ineligible to take part in the promotional process. [DSMF ¶ 67].

Additional facts will be set forth as necessary during discussion of Plaintiff's claims.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of asserting the basis for its motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Apcoa, Inc. v. Fidelity Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990).  The movant is not required, however, to negate its opponent's claim; the movant may discharge its burden by merely "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  After the movant has carried its burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing that there is a genuine disputed issue for trial; the non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like.  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is material when it is identified as such by the controlling substantive law.  Id. at 248.  Moreover, the non-movant "must do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." Anderson, 477 U.S. at 249-50. Thus, the Federal Rules mandate the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

## III.   DISCUSSION

Plaintiff Clyde Anthony asserts that Defendant DPS discriminated against him on the basis of his race in violation of Title VII. [Doc. 12]. Specifically, Plaintiff alleges that Defendant subjected him to "unwarranted, relentless investigations because of his race." [Id. ¶ 25]. The Complaint asserts that Defendant took adverse actions against Plaintiff beginning August 5, 2017, when he was accused of being under the influence of alcohol while on duty. [Id. ¶¶ 6-25]. Plaintiff also alleges that Defendant denied him promotions on the basis of his race. [Id. ¶ 26]. Defendant DPS has moved

for summary judgment pursuant to Rule 56 on Plaintiff's Title VII claims based on the pleadings, statement of material facts, and exhibits submitted to the Court.  [Doc. 45].

### A.  Investigation into August 5, 2017 Incident

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ."  42 U.S.C. § 2000e-2(a)(1).  In a Title VII employment discrimination action, the plaintiff carries the burden of showing that the defendant has unlawfully discriminated against him.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-55 (1981).  Because Plaintiff Anthony relies on circumstantial evidence, his racial discrimination claims are evaluated using the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework, the allocation of burdens and order of presentation and proof are as follows: (1) the plaintiff has the burden of proving a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the action taken against the employee; and (3) should the defendant carry this burden, the plaintiff must have an opportunity to prove that the legitimate reason offered by the defendant was a pretext for discrimination.  See id. at 802-05.

Plaintiff testified to the following: "I feel that I'm discriminated against because of my race for one fact only.  I feel if I was white I would have been treated better in [the August 5, 2017] case."  [Pla. Dep. at 23; DSMF ¶ 40].  A plaintiff can establish a *prima facie* case of racial discrimination by showing the following: (1) he belongs to a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified to perform the job in question; and (4) his employer treated "similarly situated" employees outside his protected class more favorably.  See Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1220-21, 1235 (11th Cir. 2019) (en banc).  As noted *supra*, Plaintiff alleges that DPS took adverse actions against him on the basis of his race beginning Saturday, August 5, 2017, when he was accused of being under the influence of alcohol while on duty.  [Doc. 12 ¶¶ 6-25].  The Court finds that Plaintiff is able to establish the first and third *prima facie* elements.  Plaintiff is a member of a protected class because he is African-American.  [DSMF ¶ 1].  The evidence also reveals that Plaintiff was qualified for the rank of Trooper First Class 2 and Defendant DPS makes no argument to the contrary.  [DSMF ¶¶ 2, 3; Doc. 45-1 at 10].

The second *prima facie* element requires Plaintiff to show that Defendant subjected him to an adverse employment action.  Plaintiff was placed on administrative leave in August 2017.  [Pla. Dec. ¶ 3].  Defendant DPS argues that this employment action did not rise to the level of adversity necessary to bring a Title VII discrimination

claim.  [Doc. 45-1 at 10-12].  "Not all employer actions that negatively impact an employee qualify as 'adverse employment actions.'"  Howard v. Walgreen Co., 605 F.3d 1239, 1245 (11th Cir. 2010) (citing Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1238 (11th Cir. 2001)).  "Rather, only those employment actions that result in 'a *serious and material* change in the terms, conditions, or privileges of employment' will suffice."  Id. (quoting Davis, 245 F.3d at 1239 (emphasis in original)).  In other words, the adversity must be more than "some de minimis inconvenience or alteration of responsibilities."  Doe v. DeKalb County School District, 145 F.3d 1441, 1453 (11th Cir. 1998).  "'Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.'"  Howard, 605 F.3d at 1245 (quoting Davis, 245 F.3d at 1239).

In support of its argument that Plaintiff did not suffer an adverse employment action, Defendant asserts that DPS policy contemplates that employees may be placed on leave during investigations and that such periods of leave are not considered disciplinary actions.  [Doc. 45-1 at 10-11].  Plaintiff received his full pay and benefits while he was on administrative leave, and Defendant points out that Plaintiff was on leave for some of the time due to his own medical condition before he was cleared for duty.  [Id. at 11; Pla. Dep. at 45].  In addition, Defendant asserts that while Plaintiff

was on leave, his supervisor reported concerns about a video he posted online which led to a second investigation.  [Doc. 45-1 at 11].  Finally, when Plaintiff returned to work on February 1, 2018, after being on leave, he did not experience a demotion or a reduction in pay.  [Pla. Dep. at 45, 63, Exs. 11, 16; Maier Aff. ¶ 17].

The Court disagrees with Defendant and finds that a reasonable jury could conclude that when Plaintiff was placed on administrative leave, he suffered a serious and material change in the conditions of his employment.  Defendant DPS placed Plaintiff on administrative leave on Monday August 7, 2017.  [Pla. Dec. ¶ 3].  Plaintiff was on administrative leave with pay until he returned to work on February 1, 2018.  [Pla. Dep. at 45, 63, Exs. 11, 16; Maier Aff. ¶ 17].  Defendant is correct that Plaintiff did not suffer any loss in pay or reduction in benefits from DPS while on administrative leave.  [Doc. 45-1 at 11; Pla. Dep. at 45].  However, prior to being placed on leave, Plaintiff worked secondary jobs at a church and at construction zones and earned around $30,000 or $40,000 extra each year.  [Pla. Dep. at 44-46].  Plaintiff testified that he did not work any secondary jobs while on administrative leave after SFC James Buchanan told him that he was not permitted to work a secondary job in law enforcement or security.  [Id. at 42, 44-45].  The evidence reveals that Plaintiff lost a significant amount of secondary income as a result of being placed on administrative

leave by Defendant DPS.  Given these facts, the Court finds Plaintiff is able to prove that he suffered an adverse employment action.

The final *prima facie* element requires Plaintiff to show that his employer treated "similarly situated" employees outside his protected class more favorably.  To make this showing, Plaintiff "must demonstrate that [he] and [his] proffered comparators were 'similarly situated in all material respects.'"  Lewis, 918 F.3d at 1218.  The Eleventh Circuit has explained that ordinarily, a similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff, . . . will have been subject to the same employment policy, guideline, or rule as the plaintiff, . . .  will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff, . . . and will share the plaintiff's employment or disciplinary history[.]"  Id. at 1227-28.  "In short, as its label indicates–'all material respects'–a valid comparison will turn not on formal labels, but rather on substantive likenesses."  Id. at 1228.

Plaintiff argues that a white employee named John McMillan is a proper comparator who was treated more favorably by Defendant DPS.  [Doc. 47 at 5-8; DSMF ¶ 41; Pla. Dep. at 24].  On or around September 11, 2015, then-Corporal McMillan responded to the scene of a crash.  [DSMF ¶ 42].  TFC Jerry Parrish, who was involved in the crash, along with two other law enforcement officers, detected an

odor of alcohol on McMillan. [DSMF ¶ 43]. Lieutenant Lance Greene, Assistant Troop Commander for Troop D, conducted an investigation in which he determined that McMillan had consumed alcohol while on-call. [DSMF ¶ 44]. McMillan was administered an alco-sensor test, the results of which were .019, below the legal definition of driving under the influence. [DSMF ¶ 45]. McMillan admitted that he had consumed alcohol while on-call. [DSMF ¶ 46].

There was a troop-level investigation into McMillan's actions. [DSMF ¶ 47]. During the investigation, McMillan was placed on administrative leave with pay. [DSMF ¶ 48]. At the conclusion of the investigation, Troop D Commander Captain Dennis Dixon recommended to Major Tommy Waldrop that McMillan receive a 90-day suspension of his vehicle-take-home privilege, 30 of which were to be spent on an in-troop detachment at Post 2 LaGrange, where he would be required to spend his on-call nights at the Post. [DSMF ¶ 49]. Major Waldrop rejected the recommendation of Captain Dixon, and demoted McMillan from Corporal to Dispatcher 1, with a corresponding drop in salary. [DSMF ¶ 50]. Although McMillan was still employed by DPS, his demotion from Corporal to Dispatcher meant that he had no responsibilities, duties, or activities of a law enforcement officer. [Maier Aff. ¶ 21; DSMF ¶ 51]. McMillan remained on administrative leave for the duration of the investigation and decision-making process. [DSMF ¶ 52]. McMillan's demotion took

19

effect on December 15, 2015. [Waldrop Dep. at 71-72].

The Court agrees with Plaintiff that a reasonable jury could find that he and McMillan are similarly situated. Both men were law enforcement officers employed by DPS and both men were found to have alcohol in their systems while on duty. The Court must next determine whether Plaintiff has offered evidence that Defendant treated McMillan more favorably than Plaintiff.

Plaintiff contends that during the investigation of McMillan, DPS disregarded the State Personnel Regulations and Policies. [Doc. 47 at 7]. According to Plaintiff, the regulations in effect at the time "required that Mr. McMillan be terminated for having alcohol in his system." [Id.]. In support of this argument, Plaintiff cites to Rule 478-1-.21, "Drug and Alcohol Free Workplace Program," which Plaintiff has attached to his response brief. [Doc. 47 at 7; Doc. 47-3 at 15]. The cited portion of the regulation provides, in part: "If a P.O.S.T. certified employee has a verified positive drug test result or a confirmed positive alcohol test, the Appointing Authority will notify the employee, in writing, of immediate termination of employment." Ga. Comp. R. & Regs. 478-1-.21 (12)(b).

The Court finds Plaintiff's reliance on this regulation to be insufficient to support his argument that DPS treated McMillan more favorably. As Defendant notes, the same regulation was in place both when McMillan was investigated in September 2015

and when Plaintiff was investigated in August 2017.  See Ga. Admin. Code 478-1-.21.
A revised version of the regulation did not become effective until December 4, 2018.
Id.  Therefore, even assuming that Plaintiff is correct in arguing that Rule 478-1-.21
"required that Mr. McMillan be terminated for having alcohol in his system," this fact
merely establishes that Defendant DPS did not follow the regulation in either
McMillan's case or in Plaintiff's case.  Both McMillan and Plaintiff were found to have
alcohol in their systems[2] after being administered alco-sensor tests, but neither
employee was terminated.  [DSMF ¶¶ 19, 45].

Plaintiff also cites to a policy that was in effect at the time of his investigation,
Policy 5.08.  [Doc. 47 at 7; Doc. 41-3, Pla. Dep., Ex. 3].  But like Rule 478-1-.21, this
policy provides, "Any P.O.S.T. certified employee whose test result is confirmed
positive for alcohol or verified positive by the MRO (Medical Review Officer) for
illegal drugs will be terminated."  Policy 5.08.3 (I); [Doc. 41-3, Pla. Dep., Ex. 3].
Plaintiff was not terminated despite this policy being in place and Plaintiff has failed
to show how this policy supports his argument that Defendant DPS treated McMillan
more favorably than Plaintiff.

---

[2]  It is against DPS policy for employees to be under the influence of alcohol
while on duty, even if their level of intoxication does not rise to the limit of being
legally impaired.  [DSMF ¶ 20].

The Court also notes that although the parties have not briefed the issue, it appears that "a confirmed positive alcohol test" under Rule 478-1-.21 (12)(b) and a "test result [which] is confirmed positive for alcohol" under Policy 5.08.3 mean more than "having alcohol in [a person's] system" as Plaintiff argues. Rather, both policies seem to state that a confirmed positive alcohol test is one which indicates an alcohol concentration of 0.02 percent or greater. See Ga. Comp. R. & Regs. 478-1-.21 (1)(c)(4); Policy 5.08.3 (K). If this is the case, then it is understandable that DPS did not terminate the employment of either McMillan or Plaintiff because when McMillan was administered an alco-sensor test, the results were .019, and when Plaintiff was administered two alco-sensor tests, the results were .016 and .014, respectively. [DSMF ¶¶ 19, 45]. The results from both McMillan and Plaintiff were below the legal definition of driving under the influence, and Plaintiff cites to no other comparators except McMillan.

The Court finds that although Plaintiff and McMillan are similarly situated, Plaintiff has failed to offer evidence that Defendant treated McMillan more favorably. See Lewis, 918 F.3d at 1221, 1224. As previously noted, both men were law enforcement officers found to have alcohol in their systems while on duty. During the investigation into Plaintiff's actions on August 5, 2017, he was placed on administrative leave until February 1, 2018. [Pla. Dep. at 63, Exs. 11, 16]. However,

during some of this time in November 2017, Plaintiff was on FMLA leave as he had requested.   [DSMF ¶¶ 30-32; Pla. Dep. at 59-60].   McMillan was placed on administrative leave beginning September 15, 2015 and remained on leave until he was demoted on December 15, 2015.  [Waldrop Dep. at 71-72].

McMillan was on administrative leave for approximately three months while Plaintiff was on administrative leave for approximately five months.[3]  If there were no other differences in treatment between the two employees, then a reasonable jury could find that DPS treated McMillan more favorably than Plaintiff because Plaintiff was on administrative leave with pay for approximately two more months.  But the evidence does not reveal that McMillan received more favorable treatment.

When Plaintiff returned to work on February 1, 2018, he did not experience any change in rank or pay.  [Pla. Dep. at 45, 63, Exs. 11, 16; Maier Aff. ¶ 17].  In contrast, McMillan was demoted from Corporal to Dispatcher 1, with a corresponding drop in salary.  [DSMF ¶ 50].  Although McMillan was still employed by DPS, his demotion from Corporal to Dispatcher meant that he had no responsibilities, duties, or activities of a law enforcement officer.  [Maier Aff. ¶ 21; DSMF ¶ 51].  A reasonable jury could not examine these facts and find that the demotion of McMillan and the reduction of

---

[3] Both McMillan and Plaintiff continued to receive their full pay while on administrative leave.  [Pla. Dep. at 45; DSMF ¶ 48].

his pay constituted more favorable treatment than that received by Plaintiff, who retained his rank and pay.  Because McMillan is the only comparator identified by Plaintiff, the undersigned concludes that Plaintiff has failed to show that Defendant DPS treated a similarly situated employee outside his protected class more favorably.

The Eleventh Circuit, however, has made it clear that the "failure to produce a comparator does not necessarily doom the plaintiff's case." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  Summary judgment is improper "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (citation and internal quotation marks omitted).  This court has explained:

> Smith does not represent an alternative analytical framework to that established by McDonnell Douglas and its progeny; instead, it sets out an alternative way for plaintiffs to satisfy the prima facie case requirement and clarifies the summary-judgment standard in Title VII cases.  Put simply, Smith holds that plaintiffs can establish a prima facie case, as required by McDonnell Douglas and its follow-on cases, without pointing to a similarly situated comparator.

King v. Ferguson Enterprises, Inc., 971 F. Supp. 2d 1200, 1214 (N.D. Ga. 2013), aff'd, 568 F. App'x 686 (11th Cir. 2014) (per curiam).  Thus, at the *prima facie* stage under McDonnell Douglas, a "Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a

discriminatory criterion illegal under the Act." <u>Int'l Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 358 (1977).

Plaintiff Anthony is unable to carry this burden.  In the argument portion of his response brief, Plaintiff does not cite to any evidence adequate to create an inference that Defendant DPS' decision to conduct an investigation into the August 2017 incident and place Plaintiff on administrative leave with pay was based on his race.  [Doc. 47 at 5-8].  A reasonable jury could not examine the record and find that any decisionmaker involved in the actions about which Plaintiff complains was motivated by racially discriminatory animus.

In summary, the Court concludes that Plaintiff is unable to establish a *prima facie* case of discrimination based on race.  Although Plaintiff has identified a similarly situated comparator outside his protected class, John McMillan, Plaintiff has failed to show that McMillan was treated more favorably.  <u>See Lewis</u>, 918 F.3d at 1218. Plaintiff also has failed to offer "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." <u>Smith</u>, 644 F.3d at 1328 (citation and internal quotation marks omitted).  For these reasons, it is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 45] be **GRANTED** on Plaintiff's Title VII racial discrimination claim based on the August 5, 2017 incident and the investigations which followed.  [Doc. 12 ¶ 25].

### B.   <u>Failure to Promote Claim</u>

Plaintiff Anthony's next claim is that Defendant DPS violated Title VII by denying him promotions on the basis of race.   [Doc. 12 ¶ 26; Doc. 47 at 11-13]. Plaintiff alleges in his Complaint that he "did not receive a promotion to Trooper First Class 3 on September 1, 2017, unlike white troopers who were timely promoted based upon their tenure." [Doc. 12 ¶ 13].   Plaintiff also asserts in his Complaint that he was not eligible to take the Corporal exam in mid-January 2018 because he was still out on administrative leave at that time. [4] [Id. ¶ 12].   To establish a *prima facie* case of failure to promote, a plaintiff must show: (1) that he belongs to a protected group; (2) that he sought and was qualified for the position that the employer was attempting to fill; (3) that despite his qualifications he was rejected; and (4) that the position was filled with a person outside of the plaintiff's protected group.  <u>See</u> <u>Vessels v. Atlanta Independent School System</u>, 408 F.3d 763, 768 (11th Cir. 2005); <u>Walker v. Mortham</u>, 158 F.3d 1177, 1185-93 (11th Cir. 1998).

In support of his claim based on the denial of a promotion to Trooper First Class 3 in September 2017, Plaintiff notes that he testified, "I think I talked to a couple of the Black troopers" about the fact that "there were three other troopers who were eligible

---

[4] In his response brief filed in opposition to Defendant's summary judgment motion, Plaintiff's discussion offered in support of his failure to promote claim based on both promotions is only two pages long.  [Doc. 47 at 11-13].

on September 1st, 2017, but who did not get promoted." [Doc. 47 at 11; Pla. Dep. at 79-80]. Plaintiff also testified that in March or April 2018, an EEOC investigator asked him if he knew a black trooper named Rodney Curtis. [Doc. 47 at 11; Pla. Dec. ¶ 12]. The investigator allegedly told Plaintiff that there were some similarities between "Curtis' inability to get promoted" and Plaintiff's promotion complaints. [Id.]. Plaintiff stated that Curtis later "telephoned [Plaintiff] and voiced his complaints of not being promoted while his white counterparts received promotions." [Id.]. Plaintiff testified, "[Curtis] mentioned that he had, or was going, to file an EEOC charge. I did not comment, but I did listen." [Id.].

The Court finds that Plaintiff has failed to establish a *prima facie* case of racially discriminatory failure to promote. In Plaintiff's response brief, he does not cite to any evidence showing that he sought and was qualified for the Trooper First Class 3 position in September 2017 or that the position was filled by a person outside his protected group. [Doc. 47 at 11-12]. Plaintiff does not even make such an allegation. [Id.]. Plaintiff also has not presented "a convincing mosaic of circumstantial evidence" that would permit a reasonable jury to infer that Defendant denied him the Trooper First Class 3 promotion on the basis of his race. Smith, 644 F.3d at 1328.

With regard to the statements allegedly made by Trooper Curtis, the EEOC investigator, and the unnamed black troopers, Plaintiff has not established that these

statements are properly before the Court as they consist of hearsay and vague and conclusory allegations.  But even assuming that the statements should be considered by the Court in evaluating the present summary judgment motion, the statements would not create a genuine issue of material fact in support of Plaintiff's failure to promote claim.  Plaintiff has merely alleged that some other black troopers did not get promoted in September 2017, that trooper Curtis complained to Plaintiff about not being promoted, and that an EEOC investigator told Plaintiff that there were some similarities between Curtis' situation and Plaintiff's complaints.  [Doc. 47 at 11-12; Pla. Dep. at 79-80; Pla. Dec. ¶ 12].  A reasonable factfinder could not examine these statements and conclude that DPS decided not to promote Plaintiff to Trooper First Class 3 on the basis of his race.  Because Plaintiff is unable to establish a *prima facie* case of failure to promote with respect to the Trooper First Class 3 position, summary judgment is warranted.

Plaintiff next asserts that Defendant subjected him to racial discrimination when he was denied a promotion to Corporal.  [Doc. 47 at 12-13].  Plaintiff alleges in his Complaint that he was not eligible to take the Corporal exam in mid-January 2018 because he was still out on administrative leave at that time.  [Doc. 12 ¶¶ 12, 26].  There is no DPS policy which states that employees on administrative leave are ineligible to take part in the promotional process.  [DSMF ¶ 67].  Plaintiff, however, testified that

when the September 2017 Corporal Exam was taking place, he was out on administrative leave and his then-Corporal, Chad Harris, phoned Plaintiff and told him "not to attend an official matter in DeKalb County which was previously generated before [he] was placed on Administrative Leave." [Pla. Dec. ¶ 10]. According to Plaintiff, Harris stated that Plaintiff "was not to handle or participate in any official matters having any connection with the Department or until [his] Administrative Leave was over." [Id.]. This is Plaintiff's entire argument in support of his Title VII failure to promote claim with regard to the Corporal promotion in January 2018, and the Court finds it unpersuasive. [Doc. 47 at 12-13].

Establishing a *prima facie* case of failure to promote is not burdensome. As previously noted, a plaintiff merely has to show, *inter alia*, that the desired position was filled with a person outside of the plaintiff's protected group. See Vessels, 408 F.3d at 768. Plaintiff, however, does not allege that someone outside his protected group was promoted to Corporal during the relevant time period. [Doc. 47 at 12-13]. Instead, Plaintiff alleges that he did not take the Corporal Exam in January 2018 because he was on administrative leave and Corporal Harris told him not to get involved in official matters while on leave. [Doc. 47 at 12-14]. However, Plaintiff has not offered any evidence that Harris's instruction was based on race or that Harris was motivated by racially discriminatory animus when he allegedly communicated this

29

instruction to Plaintiff.  [Doc. 47 at 12-14].  The evidence cited by Plaintiff merely shows that Harris's instruction was not consistent with DPS policy because employees on administrative leave apparently are eligible to take part in the promotional process. [DSMF ¶ 67].

Although Harris was incorrect when he told Plaintiff not to get involved in official matters while on administrative leave, this fact would not permit a reasonable jury to find that DPS denied Plaintiff a promotion based on race.  Harris's incorrect statement could have been relevant to an analysis of whether a proffered legitimate, non-discriminatory reason for not promoting Plaintiff was pretextual.  However, before the Court evaluates pretext, Plaintiff must first establish a *prima facie* case of discrimination by offering evidence which "gives rise to an inference of unlawful discrimination."  See Lewis, 918 F.3d at 1223.  Plaintiff has not offered such evidence.

Plaintiff cites to a document identified as Exhibit B and which is allegedly a "statistical analysis" and part of Plaintiff's "EEOC investigative file."  [Pla. Dec. ¶ 13; Doc. 47-4].  Plaintiff contends that this document establishes that "the EEOC did find statistically, there was a great disparity between a white trooper's career progression to Corporal level and above positions and an African-American trooper's career progression."  [Doc. 47 at 14].  Defendant objects to the document and argues that it should not be considered by the Court.  [Doc. 50 at 2-5].  Defendant contends that the

30

exhibit is inadmissible hearsay, unauthenticated, improper expert testimony, and purports to speak to an ultimate issue.  [Id.].

Rule 56 provides, "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  The Advisory Committee Notes state, "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56(c)(2), 2010 Advisory Committee Notes.  The Court finds that Plaintiff has failed to carry this burden.  Under Federal Rule of Evidence 901(a), a document is not admissible unless it is properly authenticated by "evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  The document at issue, which Plaintiff asserts came from his EEOC investigative file, is purportedly a statistical analysis of promotions within the DPS.  The document is not only unauthenticated and consists of unsworn statements, but as Defendant points out, the document fails to identify the author.  "The fact that the unsworn statements are contained in an EEOC file does not render them admissible."  Petty v. United Plating, Inc., No. CV-09-S-1465-NE, 2012 WL 2047532, at *2 (N.D. Ala. May 31, 2012) (citing Wells v. XPEDX, No. 8:05–CV–2193–T–EAJ, 2007 WL 2696566, at *11 (M.D. Fla. Sept. 11, 2007) ("[T]he EEOC documents Plaintiff provides in support of his response are not properly authenticated,

attached to any supporting affidavit, or otherwise verified.  The documents are also inherently inadmissible.  Thus, this court may not consider such evidence in evaluating the motion for summary judgment.")).   The document also offers improper legal conclusions about alleged discrimination.  [Doc. 47-4].  Finally, the document fails to show that the unidentified author is "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  For these reasons, the Court will not consider the document identified Plaintiff as Exhibit B.  [Doc. 47-4].

In sum, the Court finds that Plaintiff has not offered "*any* good ground for presuming that discrimination has occurred."  <u>Lewis</u>, 918 F.3d at 1223 (emphasis in original).  Plaintiff has not established a *prima facie* case of racially discriminatory failure to promote and he has not cited to evidence which would permit a reasonable jury to find that any of the decisionmakers involved in the promotion decisions were motivated by discriminatory animus.  Because Plaintiff has failed to carry his burden at the *prima facie* stage, it is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 45] be **GRANTED** on Plaintiff's Title VII claims based on the non-promotions to Trooper First Class 3 and Corporal.

## IV.  <u>CONCLUSION</u>

Based on the foregoing reasons and cited authority, the Court **RECOMMENDS** that Defendant DPS' Motion for Summary Judgment [Doc. 45] be **GRANTED** on all

of Plaintiff Clyde Anthony's claims [Doc. 12] and that this action be **DISMISSED WITH PREJUDICE**.

As this is a Final Report and Recommendation and there are no other matters pending before this Court, the Clerk is **DIRECTED** to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this __26__ day of May, 2021.


      /S/LINDA T. WALKER
      LINDA T. WALKER
      UNITED STATES MAGISTRATE JUDGE